Lori GRAY, et al., Plaintiffs,

v.

**GOLDEN GATE NATIONAL
RECREATIONAL AREA,
et al., Defendants.**

No. C–08–00722–EDL.

United States District Court,
N.D. California.

Aug. 30, 2011.

Laurence Wayne Paradis, Elizabeth Rauh Leonard, Ronald Lee Elsberry, Sidney M. Wolinsky, Disability Rights Advocates, Berkeley, CA, Stuart John Seaborn, Protection and Advocacy, Inc., Sacramento, CA, for Plaintiffs.

Bonnie Prober, Heather Renee Phillips, Jennifer Beth Kaplan, Jonathan Gordon Cooper, Joshua Wilkenfeld, Nicholas Patrick Cartier, U.S. Department of Justice, Brian G. Kennedy, Washington, DC, for Defendants.

### ORDER GRANTING MOTION FOR CLASS CERTIFICATION

ELIZABETH D. LAPORTE, United States Magistrate Judge.

## I. Introduction

By way of this Motion for Class Certification, individual plaintiffs Lori Gray, Peter Mendoza, Ann Seick, and Marc Sutton and institutional plaintiff California Council of the Blind seek to certify a class defined as: "All

persons with mobility and/or vision disabilities who are being denied programmatic access under the Rehabilitation Act of 1973 due to barriers at park sites owned and/or maintained by Golden Gate National Recreation Area. For the purpose of class certification, persons with mobility disabilities are those who use wheelchairs, scooters, crutches, walkers, canes, or similar devices to assist their navigation. For the purpose of class certification, persons with vision disabilities are those who due to a vision impairment use canes or service animals for navigation."[1]

Plaintiffs seek injunctive relief only under Federal Rule of Civil Procedure 23(b)(2). Defendants Golden Gate National Recreation Area ("GGNRA") and the National Park Service ("NPS") do not dispute that Plaintiffs have satisfied the numerosity and adequacy requirements for class certification. Instead, they contend that no class may be certified because individualized attributes of different park assets, differences in disabilities across the proposed class, and differences in the efficacy and reasonableness of any remedial accommodations all preclude a finding of commonality or typicality. Defendants further argue that no class should be certified because class wide injunctive relief is unavailable and no injunction complying with both Federal Rules of Civil Procedure 23 and 65 could be fashioned. For the following reasons, the Motion for Class Certification is GRANTED.

## II. Factual Background

### A. The Rehabilitation Act of 1973

■ Plaintiffs' sole claim alleges a violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. This statute provides in pertinent part that "No ... individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination ... under any program or activity conducted by any Executive agency." To prove a violation of section 504, Plaintiffs must show that: (1) they are disabled within the

meaning of the Rehabilitation Act; (2) they are otherwise qualified; (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity; and (4) the program or activity is carried out by a federal executive agency or with federal funds. *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C.Cir.2008).

It is undisputed that the GGNRA and the NPS are subject to Section 504. It is also undisputed that Plaintiffs and the proposed class are persons with disabilities who are qualified to participate in the programs and activities at issue. Therefore, the primary issue in this case is whether they were excluded from, denied the benefit of, or subject to discrimination under a program or activity. Further, Defendants may assert an affirmative defense that accommodating the plaintiffs' disabilities would constitute an undue burden. In class actions claiming systemic violations of Section 504, in some cases Courts have ordered system-wide injunctive relief under Section 504. *See, e.g., Armstrong v. Davis*, 275 F.3d 849, 870–72 (9th Cir.2001), *abrogated on other grounds as recognized by Harris v. Alvarado*, 402 Fed. Appx. 180, 181 (9th Cir.2010).

### B. Plaintiffs

Organizational Plaintiff California Council of the Blind ("CCB") is a non-profit organization composed of Californians who are blind or have low vision. The mission of CCB is to gain full independence and equality of opportunity for all blind and visually disabled Californians. Appendix of Plaintiffs' and Class Members' Declarations ("Appx."), Ex. I (Lozano Decl.) ¶ 4; Third Amended Complaint ("TAC") ¶ 16. Several CCB members have experienced access barriers at GGNRA parks. *See* Appx. Ex. A (Buchmann–Garcia Decl.); Lozano Decl. ¶¶ 11–13; Appx. Ex. C (Donovan Deck); Appx. Ex. G (Knudson Deck); Appx. Ex. K (Moses Decl.) Decl. ¶¶ 1, 3.

---

1. The parties stipulated to this revised class definition after the hearing, except that the Court substituted "For the purpose of" in the third

sentence in lieu of "For purposes of" to make it consistent with the second sentence.

The individual named Plaintiffs all have visual and/or mobility disabilities and have experienced access barriers at GGNRA parks in approximately the last ten years. Lori Gray has both visual and mobility disabilities and has encountered numerous access barriers at multiple GGNRA parks. Appx. Ex. E (Gray Decl.) ¶¶ 1, 4–26; TAC ¶ 12. Peter Mendoza has mobility disabilities and uses a wheelchair, and has experienced multiple access barriers at multiple GGNRA parks. Appx. Ex. J (Mendoza Deck); TAC ¶ 13. Ann Sieck has a mobility disability and uses a wheelchair and has encountered multiple access barriers at multiple GGNRA parks. Sieck Decl. ¶¶ 1, 3; TAC ¶ 14. Marc Sutton is blind and has encountered multiple access barriers at multiple GGNRA parks. Appx. Ex. P (Sutton Decl.) ¶¶ 1, 6–13; TAC ¶ 15. Mr. Sutton has also experienced barriers trying to access the GGNRA website using his screen access software. Sutton Decl. ¶ 13.

In their TAC, Plaintiffs allege that Defendants have systematically discriminated against them on the basis of their vision and/or mobility disabilities by failing to provide adequate accommodations. None of the named Plaintiffs claim to have encountered all of the alleged barriers at all of the GGNRA parks at issue in this litigation, and instead each has only encountered a subset of the barriers at some of the parks within the GGNRA. *See* Appx. Exs. E, I, J, O. Many of the barriers that Plaintiffs seek to have remedied have not been encountered by any named Plaintiff, and the named class Plaintiffs do not claim to have yet been injured by them. *Id.* Plaintiffs' TAC seeks "an order enjoining Defendants from violating Section 504(a) of the Rehabilitation Act," and a declaration that GGNRA is being operated in a discriminatory manner and fails to provide required access, as well as costs and fees. TAC at pages 16–17. Their motion for class certification refers to "thousands" of barriers that they seek to have remediated. *See* Motion at 1, 10.

## C. Golden Gate National Recreation Area

Among the world's largest urban national parks, GGNRA consists of a number of park areas encompassing more than 75,000 acres bordering the California coastline for nearly sixty miles in and around the San Francisco Bay Area. TAC ¶ 2. GGNRA has been described as the "backyard" of Bay Area residents, but also attracts approximately 20 million visitors from around the United States and the world. Pl.'s Request for Judicial Notice ("Pl.'s RJN") Exs. A, B. GGNRA is comprised of at least 36 separate park units, and boasts "a huge variety of natural and cultural resources and different ecological zones that will interest almost anyone." *Id.* Ex. E, F.

## D. GGNRA's Accessibility Compliance

Section 504 of the Department of Interior ("DOI") regulations required that by March 1988, all entities within the DOI prepare self-evaluation and transition plans covering their policies, practices, and facilities. 43 C.F.R. §§ 17.510 & 17.550(d). The plans were required to: (1) identify physical obstacles in the agency's facilities that limit the accessibility of its programs or activities to disabled persons; (2) describe in detail the methods that will be used to make the facilities accessible; and (3) specify the schedule for taking the steps necessary to achieve compliance and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period. *Id.* § 17.550(d). GGNRA developed a plan that purported to identify accessibility barriers and solutions for making the facilities and programs at issue accessible.[2]

In 2000, an individual named Mr. De La O was designated to perform the duties of Accessibility Coordinator for GGNRA. Elsberry Decl. Ex. A (De La O Depo.) 9:16–13:6.

---

2. Plaintiff's expert opines that the 1988 plan was inadequate because it failed to meaningfully address how to make many of GGNRA's programs, facilities, and activities programmatically accessible, did not address various barriers, was impermissibly vague, and contemplated work that was never completed. *See* Declaration of Peter Margen ("Margen Report") at 4; *see also* Elsberry Decl. Ex. B (Dean Depo.) 98:25–99:22; Ex. A (De La O Depo.) 77:6–78:13 (GGNRA officials do not know if recommended work was ever completed or if there is funding for the work).

Mr. De La O discovered that some of the information in the 1988 transition plan was obsolete and/or inaccurate. *Id.* at 27:9–27:12; 34:10–34:25 (plan excluded issue of access to trails or beaches); 35:2–36:1 (as of 2000, too many inaccessible GGNRA facilities to mention). He prepared a December 2000 update to the 1988 transition plan. The updated plan did not address trails and beaches, and focused on certain features such as entrances, restrooms, and parking. De La O Depo. 35:2–35:12; Margen Report 4. The updated plan also did not fully assess GGNRA's "park partners." De La O Depo. 112:4–112:7. Plaintiffs define these as outside entities that operate and/or provide facilities, programs, or services at GGNRA parks, and Defendants have not disputed this definition.

In 2006, NPS began discussions with the National Center on Accessibility ("NCA") to conduct physical and programmatic assessment of its programs, policies, and facilities. De La O Depo. 51:10–52:13, 83:17–84:5. However, NCA assessment work did not begin until 2007 in part because of funding issues, communication with Washington D.C., and because Mr. De La O was not certified to oversee cooperative and task agreements such as the one with NCA. *Id.* 52:14–52:23. In early 2007, as part of an agreement between the parties to facilitate settlement of this action, NPS and NCA entered into an arrangement pursuant to which NCA would conduct an evaluation and prepare a transition plan for all GGNRA policies, facilities, and programs. *Id.* 51:10–52:13; Dkt. No. 33 (MOU) at 2–3.[3] NCA was not provided with the 1988 transition plan or the 2000 updated plan so that NCA would start from scratch. De La O Depo. 83:17–84:5. On January 31, 2008, Plaintiffs filed this action, following over a year of pre-litigation negotiations. By 2008, less than half of the barriers identified in the updated plan had been remedied. De La O Depo. 78:14–78:21.

In November 2008, the parties to this action executed a Memorandum of Understanding ("MOU"). *See* Dkt. No. 33. The MOU divided GGNRA into six "phases," and called for an assessment by NCA of GGNRA's facilities and policies to identify those barriers and conditions that needed to be remedied to meet the requirements for program access under Section 504, and propose remedies to such barriers. MOU 2–3. The assessments for Phases I and II were completed in June 2009, and NCA prepared written reports of these assessments prioritizing barriers according to a three-level system ("minor," "serious," or "critical") developed by NPS. Elsberry Decl. Ex. C; De La O Depo. 119:8–119:22. The assessment identified numerous access barriers, many of which were found to be serious or critical, and recommended solutions for most of the barriers and a proposed remediation timetable. Elsberry Decl. Ex. C. Based on these assessments, Defendants prepared a draft transition plan for Phases I and II. Elsberry Decl. Ex. D. Thereafter, NCA conducted an assessment of facilities included in Phase III and prepared a report in February 2010 identifying numerous serious and critical access barriers and recommended solutions for most of the barriers and a proposed remediation timetable. Elsberry Decl. Ex. E.

In July 2010, NCA also prepared a draft self-evaluation of GGNRA's park-wide policies and procedures and recommended necessary changes in such policies and procedures. *Id.* Ex. F. This assessment found approximately thirty system-wide deficiencies in policies and procedures relating to, among others: unavailability of public information on accessibility features and services, park partners and permitted groups' lack of understanding and commitment to accessibility and lack of assessment of their compliance with accessibility requirements, lack of

---

3. Defendants challenge Plaintiff s label of NCA as "Defendants' expert" and do not concede the reliability of NCA's methods or the accuracy of these opinions. However, Plaintiffs point out that NCA was hired before this litigation began and has had an agreement with NPS since 1992. *See* Elsberry Reply Decl. Ex. B at 35. One of the two employees assigned to NPS' Accessibility Management Program works on-site at NCA. El-

lis Depo. at 107–108. Further, NPS engaged NCA to work on the GGNRA project and jointly prepared the draft transition plans for Phases I and II. Elsberry Reply Decl. Ex. B at 19–20. Thus, Plaintiffs have some basis for that characterization. In any case, as discussed elsewhere, several of the reports prepared by NCA are relevant and have been considered in connection with this motion as discussed below.

training on procedures for accommodating the disabled during emergency situations, failure to consider needs of disabled in new and existing programs, lack of oversight, lack of accessible orientation and exhibit information, failure to apply accessibility standards in new construction, and inconsistent maintenance and inspection of accessible trails. *Id.* The individual in charge of NCA's assessment and planning for GGNRA, Sherril York, has testified that, though not final, the substance of the findings in the July 2010 report will not change. Elsberry Decl. Ex. G (York Depo.) 148:12–149:3.3.

After completion of the Phase III assessments, NCA conducted a Phase IV assessment of barriers at trails in different park areas within GGNRA, and prepared a draft report that identified programmatic barriers and recommended solutions. Elsberry Decl. Ex. H; York Depo. 74:6–74:20. Thereafter, settlement discussions between the parties ceased, and Plaintiffs therefore do not know whether NCA will perform assessments of Phases V and VI.[4] Plaintiff's expert has conducted "sample inspections" of Phase V locations and found barriers at every sampled location. Margen Report 5–6, 10–18. Mr. Margen has concluded that virtually no trails in GGNRA meet the standards for disability access, and all but a very few are entirely unusable by people with significant mobility disabilities. *See* Elsberry Decl. Ex. H; Margen Report 7–8. He further concludes that GGNRA beaches lack a "beach access route" needed by people with mobility disabilities. *See* Margen Report 8. Similarly, he believes that the exhibits contained in the various GGNRA park units are largely inaccessible to people with vision disabilities. *Id.* Further, Plaintiff's technology expert contends that the park's website and that of its partner that oversees park programs, the Golden Gate National Parks Conservancy, contain insufficient information regarding the accessibility of GGNRA numerous programs and activities and are inaccessible to the vision disabled. *See* Belser Decl.

Based on the NCA assessments and the sample inspections by Plaintiff's expert, Plaintiffs contend that there are thousands of access barriers requiring remediation. *See* De La O Depo. 143:3–143:9 (acknowledging that Phases I and II alone will require thousands of barrier removal projects); Elsberry Decl. Ex. F (York Depo.) 49:15–55:6, 60:10–60:15 (implementing a solution to eliminate or provide alternative means of access for *all* barriers identified by NCA in Phases I through III that are publicly accessible is necessary to ensure program access); Margen Report 5–6, Ellis Depo. 152 (barriers categorized as "serious" or "critical" must be remediated); De La O Depo. 120:3–120:7 (barriers categorized as "critical" must be remediated). They further contend that GGNRA's failure to initiate a plan until 2007 or ever complete self-evaluation and transition planning, an obligation which they acknowledge is *not* privately enforceable, is further evidence of Defendants' systemic failure to comply with accessibility obligations. *See Cherry v. City College of San Francisco*, 2005 WL 2620560, at *4 (N.D.Cal. Oct. 14, 2005) (failure to comply with self-evaluation and transition-plan regulations may be evidence of discrimination even if the regulations are not privately enforceable).

According to Plaintiffs, most of the previously-identified access barriers have not been remedied and there is no clear plan for remediation. With respect to Phases I and II, approximately fifty percent of the "critical" barriers have been remedied but substantial work remains to be done. De La O Depo. 153:24–154:3, 162:23–164:23. Plaintiffs believe that no work has been done with respect to the subsequent phases. Defendants are unable to identify which GGNRA facilities and programs are currently accessible. Paradis Decl. ¶ 8 (relating to GGNRA discovery response on this point). There is no firm plan for implementing the required work and funding for such work is uncertain. De La O Depo. 140:1–143:2, 141:9–142:16; Dean Depo. 20:24–26:14, 39:7–40:12, 94:3–95:19, 98:21–99:15; Ellis Depo. 96, 205;

---

4. Under the MOU, Phase VI does not identify particular park areas but includes facilities not assessed in prior phases. Plaintiffs state that they are not aware of anything that would be included in Phase VI, so the areas to be assessed in Phase V are the only areas have not yet been the subject of written transition planning by NCA.

Shaeffer Depo. 86–89. Plaintiffs also contend that GGNRA fails to properly maintain existing access features for visitors with mobility and vision disabilities. Margen Report 8; Elsberry Decl. Ex. F at 12–13. There are declarations from named Plaintiffs and other disabled members of the proposed class describing instances where access barriers interfered with and denied them opportunities to experience GGNRA programs and facilities, including restrooms, parking, trails, beaches, walkways, information and exhibits, and natural and cultural structures and features. *See generally* Gray Decl.; Mendoza Decl.; Sheldon Decl.; Sieck Decl.; Williams Decl.; Church Decl.; Donovan Decl.; Elliot Decl.; Buchmann–Garcia Decl.; Hall Decl.; Largent Decl.; Sutton Decl.; Theriault Decl.; Moses Decl.; Mueller Decl.; Van Allen Decl.; Knudson Decl.; Lozano Decl.; Rubke Decl. (all contained in Plaintiff's Appendix of Declarations).

In their Reply, Plaintiffs point to additional evidence that, while not specifically addressing the GGNRA, Plaintiffs contend shows a general policy or practice of failure of the NPS to comply with the Rehabilitation Act, including a 2000 Report entitled "Improving Access to Outdoor Recreational Activities on Federal Lands" prepared by a third party which found systemic deficiencies in a number of entities including NPS. Elsberry Reply Decl. Ex. C at I, 31–37. Plaintiffs also refer to a memo from the Director of NPS in 2006, in which he admitted that NPS was falling short in meeting the minimum amount of access required by law and stated that there needed to be more accountability. Elsberry Reply Decl. Ex. D at 1.

### III. Legal Standard

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Plaintiffs seek class certification under Rule 23(b)(2), which provides that a case may be certified as a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

A plaintiff seeking class certification bears the burden of demonstrating that each element of Rule 23 is satisfied, and a district court may certify a class only if it determines that the plaintiff has met its burden. *See General Tel. Co. v. Falcon,* 457 U.S. 147, 158–61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Doninger v. Pac. Nw. Bell Inc.,* 564 F.2d 1304, 1308 (9th Cir.1977). While the primary focus is not on the merits of the plaintiff's claims, the Supreme Court has recently recognized that:

"sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S., at 160, 102 S.Ct. 2364, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," *id.,* at 161, 102 S.Ct. 2364; *see id.* at 160, 102 S.Ct. 2364 ("[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable"). Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. " '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Falcon, supra,* at 160, 102 S.Ct. 2364 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); some internal quotation marks omitted). Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve

preliminary matters, *e.g.*, jurisdiction and venue, is a familiar feature of litigation. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676–677 (C.A.7 2001) (Easterbrook, J).

*Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2011). To satisfy itself that class certification is proper, the Court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir.1975). Ultimately, it is in the district court's discretion whether a class should be certified. *See Molski v. Gleich*, 318 F.3d 937, 946 (9th Cir.2003).

## IV. Analysis

### A. Class definition

■ As a threshold matter, before reaching the requirements of Rule 23, the party seeking class certification must demonstrate that an identifiable and ascertainable class exists. *See Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D.Cal.2009). "An implied prerequisite to certification is that the class must be sufficiently definite." *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, 2006 WL 2642528, at *3 (N.D.Cal.2006). "A class definition should be precise, objective, and presently ascertainable," though "the class need not be so ascertainable that every potential member can be identified at the commencement of the action." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D.Cal.1998) (internal quotations omitted).

Plaintiffs propose a class consisting of: "All persons with mobility and/or vision disabilities who are being denied programmatic access under the Rehabilitation Act of 1973 due to barriers at park sites owned and/or maintained by Golden Gate National Recreation Area. For the purpose of class certification, persons with mobility disabilities are those who use wheelchairs, scooters, crutches, walkers, canes, or similar devices to assist their navigation. For the purpose of class certification, persons with vision disabilities are those who due to a vision impairment use canes or service animals for navigation." There is no dispute between the parties that this definition states an identifiable and as-

certainable class of vision and mobility impaired individuals who are being denied access to various portions of the GGNRA.

### B. Rule 23(a)

#### 1. Numerosity

■ For a class to be certified, it must be so numerous that joinder of all members individually is "impracticable." *See* Fed. R.Civ.P. 23(a)(1). When evaluating numerosity, courts should consider the number of class members, whether their identities are known, the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive relief is sought. *See* William W. Schwarzer, et al., *Federal Civil Procedure Before Trial*, §§ 10:260–10:264 (Rutter Group 2009). Here, Plaintiffs have presented undisputed evidence from which it can reasonably be deducted that thousands of people from all over the country with mobility and/or vision disabilities visit GGNRA each year, or are deterred from visiting due to the alleged barriers. *See* Pl.'s RJN Ex. H (approximately 4.4% of the population is vision or mobility impaired); Ex. A (more than 20 million people visit GGNRA annually). Defendants do not dispute that Plaintiffs have satisfied the numerosity requirement.

#### 2. Commonality and Typicality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." This standard is not strictly construed:

> Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

*Hanlon v. Chrysler*, 150 F.3d 1011, 1019 (9th Cir.1998) *see also Staton v. Boeing*, 327 F.3d 938, 953 (9th Cir.2003). The Supreme Court has recently clarified the commonality requirement, at least in employment discrimination cases, by stating that: "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same inju-

ry.'" *Wal–Mart,* 131 S.Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law," but instead that their claims "depend upon a common contention ... of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Although "for purposes of Rule 23(a)(2) even a single common question will do," *id.* at 2556 (internal citation and quotation marks omitted), "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 2551 (emphasis in original).

Prior to *Wal–Mart,* commonality in disability discrimination suits has generally been deemed satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis,* 275 F.3d 849 (9th Cir. 2001) (finding commonality requirement met for putative class of individuals with different types of disabilities "all of whom suffer from the Board's failure to accommodate their disabilities"), citing *LaDuke v. Nelson,* 762 F.2d 1318, 1332 (9th Cir.1985) (holding that commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members), and *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994) (holding that individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality). *See also Californians for Disability Rights, Inc. v. California Dept. of Transp.,* 249 F.R.D. 334, 346 (N.D.Cal.2008) (certifying class of mobility and vision impaired individuals in light of the issue common to all plaintiffs, namely whether and to what extent Caltrans had violated the ADA on a "systematic basis for many years through the use of improper design guidelines and the failure to ensure compliance with even those deficient guidelines"); *L.H. v. Schwarzenegger,* 2007 WL 662463, at *12 (E.D.Cal. Feb. 28, 2007) (hold-ing that system wide deficiencies in the California juvenile parole system affect all of the putative class members with disabilities, regardless of the specific nature of their disability.)

Rule 23(a)(3) further requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality and commonality requirements are similar and tend to merge." *Californians for Disability Rights, Inc.* at 346 (N.D.Cal.2008); *see also Wal–Mart,* 131 S.Ct. at 2551, n. 5. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020; *see also L.H v. Schwarzenegger,* 2007 WL 662463, at *12–13 (holding that "minor differences among the class are inconsequential," and rejecting the defendants' assertion that plaintiffs had not shown sufficient evidence that each plaintiff was disabled since the deprivations complained of by plaintiffs affected the entire class). Although the claims of the purported class representative need not be identical to the claims of other class members, the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). That injuries may differ in amount does not defeat typicality. *See* William W. Schwarzer, *et al., Federal Civil Procedure Before Trial,* § 10:293 (Rutter Group 2009) (a plaintiff's claims may be typical although other members of the class suffered less or more injury).

Plaintiffs contend that this case is a quintessential civil rights action appropriate for class certification because it concerns Defendants' "illegal system-wide policies and practices, and their system-wide failures to take necessary action" which damage class members in the same way by creating access barriers at GGNRA. Motion at 18. Plaintiffs concede that not every class member has been exposed to the same set of access barriers, but argue that the claims stem from the same system-wide, decades-long prac-

tices and policies of failing to assess and eliminate accessibility barriers, and require a common determination of whether the policies or practices were sufficient to satisfy Defendants' legal obligations. Plaintiffs list a number of questions of law and fact that they contend are common to the class as a whole. They argue that the evidence that will resolve these common questions is the same for all class members, and injunctive relief requiring barrier removal and changes to Defendants' policies and practices regarding accessibility would apply to the class as a whole.

Plaintiffs further argue that they are typical of the class they seek to represent because they have suffered the same type and manner of injury (inability or difficulty accessing GGNRA facilities and programs) stemming from the same discriminatory practice (systemic failure to remedy access barriers or implement accessibility features) as unnamed class members. Plaintiffs rely on *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 450 (N.D.Cal.1994), which certified a class of semi-ambulatory and wheelchair bound individuals who experienced access barriers at many of the defendant's movie theaters. There, the court held that, "in a public accommodations suit such as this one where disabled persons challenge the legal permissibility of architectural design features, the interests, injuries, and claims of the class members are, in truth, identical such that *any* class member could satisfy the typicality requirement for class representation." *Id.* at 450 (emphasis in original).

Defendants counter that there are not common questions of law and fact and the named Plaintiffs are not typical, and instead the case will necessitate numerous fact-intensive, individualized inquiries in light of the inclusion of thousands of barriers allegedly experienced by putative class members but not by any named Plaintiff. They contend that, while Plaintiffs' motion attempts to characterize the suit as one based on "policies" and "practices," Plaintiffs have not actually pointed to any specific policy or practice that connects all of the alleged barriers. Instead, Defendants contend that the Court will have to examine each of the thousands of different types of barriers and their unique impact on the class members, all of whom have different types of disabilities and require different types of reasonable accommodation.[5]

Defendants break their opposition into three primary arguments: that (1) differences in challenged park attributes, (2) differences in plaintiffs' disabilities, and (3) differences in reasonable accommodations all defeat commonality and typicality. As discussed below, Plaintiffs persuasively counter that classes of disabled individuals seeking reasonable accommodation have been certified without the need for individualized assessments of each alleged barrier, each class member's disability or the type of accommodation needed. While this class is certainly larger and broader than some of the cases on which Plaintiffs rely, on balance the Court finds that Plaintiffs have met their burden of satisfying commonality and typicality for purposes of class certification.

#### a. Differences in Alleged Access Barriers

■ Defendants first argue that differences in the thousands of challenged park attributes require denial of class certification.

---

5. Defendants generally rely on *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir.2010) for the position that each barrier at issue in this case requires its own individualized inquiry and that this precludes certification. However, *Hamamoto* was a not a class action and the Ninth Circuit's decision did not touch on class certification or its commonality or typicality requirements. Instead, it held that autism-specific educational services for reasonable accommodation of two students required an individualized inquiry, and the Court then performed that inquiry and found triable issues of fact as to whether reasonable accommodations had been made for the students. *Hamamoto* is factually distinguishable from this case in part because it involved the necessity of individually tailored education plans, and does not preclude certification of a class seeking the removal of access barriers allegedly affecting the class as a whole. Many other cases cited by Defendants are also not on point for similar reasons. *See also Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996) (triable issue of whether modification of law relating to service dogs was reasonable; not a class action); *Vinson v. Thomas*, 288 F.3d 1145 (9th Cir.2002) (triable issue of fact as to whether individual plaintiff was disabled).

They contend that evidence of the barriers actually experienced by the named Plaintiffs, which does not encompass all of the park areas in question or all of the alleged barriers within in any given park area, is insufficient to bring in all of the challenged barriers, and remediation of all barriers would require a fact-intensive analysis of each barrier. Defendants rely primarily on *Castaneda v. Burger King Corp.*, 264 F.R.D. 557 (N.D.Cal.2009), in which the court denied certification of a class of mobility-impaired patrons challenging multiple alleged ADA violations at 92 Burger King stores owned and operated by franchisees of Burger King Corporation, where the stores were designed and updated without a common blueprint but with a directive to comply with disability laws. The court found that commonality was not satisfied because there was no common core of salient facts (e.g., that Burger King Corporation created common barriers across the 92 stores by way of a common blueprint) or a shared legal issue (e.g., whether the same violations existed at each of the stores in question). *Id.* at 567. Instead, the court found that it would require "bone-crushing feature-by-feature and store-by-store analyses" to establish whether and to what extent violations existed at each store. *Id.* at 564. The court rejected the plaintiffs' argument that, even though there was no common blueprint for the stores, Burger King Corporation's "failure of oversight" to ensure compliance with disability laws was sufficient for commonality. *Id.* at 568. The court held that the argument ignored the initial question of whether there were violations at each of the 92 stores, and that this determination would require 92 trials within a trial without any common method of proof. *Id.* The court also found that typicality was not satisfied where the named plaintiffs, who had not individually or cumulatively visited all of the 92 stores in question, suffered different injuries than other class members who encountered barriers at stores that the named plaintiffs did not even visit. *Id.* at 572. Instead, the court certified ten classes for the ten stores that the named plaintiffs had actually visited, finding that commonality was satisfied for these classes because "[a]ll mobility-impaired patrons of a particular restaurant who use wheelchairs face identical facilities and identical access barriers" and that the named plaintiff for each class directed to a particular store would be typical of a class of mobility-impaired individuals who encountered the same barriers at the same store. *Id.* at 572.

Defendants contend that, as in *Burger King*, Plaintiffs are asking the court to certify a class that will require a detailed analysis of each of the thousands of challenged features in a number of park areas, some of which no named Plaintiff has even visited or experienced, without any common method of proof. Defendants point out that a named Plaintiff's experience with one barrier admittedly does not necessarily translate to other barriers across the GGNRA. *See* Def.'s Appendix, Ex. B (Sutton Depo.) at 155–57 (plaintiff testifying that, to know if there is an access barrier, one would have to go facility-by-facility). Further, there is evidence that not all of the named Plaintiffs consider all of the alleged barriers to be barriers to them. For example, Mr. Sutton has not experienced access problems with bathrooms, while others have. *See id.* at 154. Dr. York of NCA has also testified that, to assess access barriers within GGNRA, it would be necessary to go facility-by-facility, trail-by-trail, bathroom-by-bathroom, beach-by-beach and no generalizations could be made about the accessibility of a feature based on information about other similar features within GGNRA. *Id.* Ex. C (York Depo. at 199–200).

Plaintiffs counter that courts regularly certify classes alleging discriminatory practices without making individual determinations about each individual barrier, and that Defendants' response to Plaintiffs' First Set of Interrogatories admits that "they are not able to identify individual facilities, if any, that do not provide meaningful access because (1) Defendants have not yet completed assessments of all public areas within GGNRA, and (2) meaningful access cannot be evaluated by considering individual facilities in a vacuum, but rather key programs and experiences must be viewed as a whole." Elsberry Reply Decl. Ex. B at 11.

Plaintiffs persuasively point out that *Burger King* was based only in part on lack of

commonality and typicality, and another factor weighing against certification of a Rule 23(b)(2) class was that damages claims predominated. Plaintiffs also distinguish *Burger King* because it involved 92 different restaurant franchises supervised by different entities that obtained their own blueprints and did not share common architecture, plans, remodels, policies or barriers. In contrast, Defendants do not seriously dispute that all of the challenged facilities and barriers are controlled by GGNRA as a centralized decision-maker. See Elsberry Decl. Ex. G (Dean Depo.) at 92 (whether funding allocated to GGNRA will be used to implement NCA's transition plan is made by the GGNRA Park Superintendent). Plaintiffs acknowledge that their lawsuit implicates the policies and practices of third-party "park partners" who operate programs and facilities within the GGNRA, but it is undisputed that GGNRA is also responsible for ensuring their compliance with access obligations.

Plaintiffs rely on *Californians for Disability Rights v. California Department of Transportation*, 249 F.R.D. 334 (N.D.Cal.2008) (hereinafter *"Caltrans"*), where a judge in this district certified a class of mobility and vision impaired individuals who claimed to have been denied access under the ADA and the Rehabilitation Act "due to barriers along sidewalks, crosswalks, pedestrian underpasses, pedestrian overpasses and any other outdoor designated pedestrian walkways throughout the state of California." *Id.* at 336. The thousands of barriers at issue were not identical and involved different physical conditions, and no named plaintiff claimed to have encountered every alleged barrier, but the court certified the class because requiring class members to individually prove each instance of discrimination would obviate the concept of a class action and preclude certification of any class. *Id.* at 345. The defendants in *Caltrans* appear to have relied on the same arguments being made by Defendants here—that the court would be required to individually examine each alleged barrier and Caltrans' remedial obligation with respect to each barrier. *Id.* at 343. They contended that there was no commonality because there was no centralized policy of discrimination, and twelve different local of-

fices made design and construction decisions. *Id.* The court rejected this "merits-based" argument, finding that Plaintiffs were "not seeking that the Court directly order and oversee the remediation of every non-compliant pedestrian feature throughout the state. Rather, they are seeking injunctive relief remedying Caltrans 'use of improper design guidelines and the failure to ensure compliance with even those deficient guidelines.' " *Id.* at 345. The court held that Caltrans' alleged centralized policy of discrimination was an issue common to all class members, and Caltrans could not defeat class certification by simply arguing that there was no such policy. The court stated that "courts regularly order the remediation of discriminatory practices in class actions without presiding over the details of the application of such remediation to each and every affected facility or individual," and held that the case was a "garden variety class action of the type routinely certified under Rule 23(b)(2)." *Id.* at 345–46.

Defendants attempt to distinguish *Caltrans* on the basis that it focused on a "common design feature for a physical asset of a specified type [that] allowed for an adjudication of the accessibility of all the Caltrans facilities that had been constructed according to that design." Opp. at 22–23. However, it does not appear that the *Caltrans* court found that there was one uniform design plan for all of the challenged barriers, but instead that allegations of a uniform policy of improper design guidelines and failure to ensure compliance with those guidelines were sufficient. 249 F.R.D. at 345. The proposed class definition approved by the Court specifically included "sidewalks, crosswalks, pedestrian underpasses, pedestrian overpasses, and any other out-door designated pedestrian walkways." The complaint alleged violations ranging from systemic failure to maintain pedestrian rights of way to failure to provide alternative routes in construction areas to failure to remedy dangerous slopes and uneven pavement. *Id.* at 334. Similarly here, Plaintiffs do not allege any uniform design plan, but instead uniform policies and practices of failing to ensure that GGNRA and various of its features and programs are

accessible to mobility and vision impaired individuals as required by law. Therefore, *Caltrans* lends support to certification here.

Additionally, in *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439 (N.D.Cal.1994), the court certified a class of mobility impaired individuals challenging the access features of 70 movie theaters built or re-modeled at various times throughout the relevant time period. The court noted that it was likely that members of the class would each have only attended some (or one) of the theaters in question, and therefore "in a sense, the proposed class is divided into more than seventy subclasses," one for each of the theaters. *Id.* at 449. However, the court found that subclasses were not necessary and commonality was satisfied for a class including all of the theaters because the design features were ones "some or all of which, they allege exist or have existed in many if not all of defendant's theaters during the relevant period" and the legality of those features was a common question. The court also found it important that the sites were owned by a single corporate defendant so the adequacy of the accommodation for ADA purposes would hinge on corporate-wide factors such as the availability of resources. *Id.* Regarding typicality, the court held that the mobility impaired named plaintiffs suffered the same injury as class members (all were subjected to legally inadequate accommodation and deterred from attending the theaters in the future) and that "in a public accommodations suit such as this one where disabled persons challenge the legal permissibility of architectural design features, the interests, injuries, and claims of the class members are, in truth, identical such that *any* class member could satisfy the typicality requirement for class representation." *Id.* at 450.

Similarly, in *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604 (N.D.Cal.2004), the court certified a class of mobility-impaired individuals (defined as those using wheelchairs or scooters) seeking to remedy various categories of architectural barriers (lines, entrances, dining rooms, rest rooms, parking lots, drink dispensers) at Taco Bell's corporate-owned and/or operated stores in California and re-

questing an "injunction ordering Defendant to adopt policies to ensure access for customers who use wheelchairs and scooters, and to bring all of its facilities into compliance" with applicable laws. *Id.* at 605. Relying on *Arnold*, the court rejected the defendants' "unique architecture" argument and found commonality and typicality met in part because the stores were built in accordance with corporate prototypes involving centralized decision-making, as well as a common question of corporate resources. *See also Access Now v. Ambulatory Surgery Center Group*, 197 F.R.D. 522 (S.D.Fla.2000) (certifying ADA class of mobility, hearing and sight impaired people against operators of hundreds of medical facilities party to a service agreement with a common program for ADA compliance, finding that allegation of common discriminatory practice and denial of access to same facilities was sufficient).

Plaintiffs' proposed class falls somewhere in between *Burger King*, on the one hand, and the cases cited by Plaintiffs, on the other. Unlike in *Burger King*, Defendants have centralized control over decision-making with respect to accessibility within the GGNRA. However, unlike in *Arnold* and *Taco Bell* there is no uniform design plan with respect to GGNRA as a whole, or even common types of features within the GGNRA. The case most on point is *Caltrans*, where the plaintiffs alleged thousands of various barriers but relied on a common Caltrans policy of non-ADA compliant guidelines and failure to ensure compliance with those faulty guidelines. Similarly here, Plaintiffs point to the thousands of access barriers but argue that the *common question* for all plaintiffs and class members is whether GGNRA's policies and practices of failing to comply with the Rehabilitation Act, the specifics of which are set forth in NCA's July 2010 report, denied them access to the GGNRA. *See* Ex. F (assessment finding approximately 30 system-wide deficiencies in policies and procedures relating to unavailability of public information on accessibility features and services, park partners and permitted groups' lack of understanding and commitment to accessibility and lack of assessment of their compliance with accessibility requirements, lack of training on proce-

dures for accommodating the disabled during emergency situations, failure to consider needs of disabled in new and existing programs, lack of oversight, lack of accessible orientation and exhibit information, failure to apply accessibility standards in new construction, and inconsistent maintenance and inspection of accessible trails). They are typical of class members because they have all been denied access to the GGNRA on the basis of this common failure of policies and practices. Based on all of the foregoing, the Court concludes that differences in the types of barriers alleged are insufficient to defeat commonality or typicality.

### b. Differences in Alleged Disabilities

■ Defendants argue that differences in the type and degree of the alleged mobility and vision impairments of the proposed class members also defeat commonality and typicality. For an access barrier to be actionable under the Rehabilitation Act, a plaintiff must show that he was denied benefits of the program "by reason of his disability." *See Weinreich v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976 (9th Cir.1997) (finding no discrimination on basis of disability in requiring individual to submit updated medical information every three years to obtain reduced fare). Defendants rely on this snippet from a non-class action case unrelated to multiple types of disabilities or barriers to conclude that evidence of a park feature's traits is insufficient to show how it limits access to a particular individual on the basis of disability because what might be a barrier to one is not necessarily a barrier to all. However, this case does not truly support Defendants' position.

For example, Defendants point out that, while NCA's guidelines require specific measurements for bathroom grab bars, a technical deficiency in measurement of a particular grab bar does not necessarily prevent any disabled person's use and whether there is a Rehabilitation Act violation requires individualized assessment of who is seeking access, the nature of that individual's disability,

and how that person is affected by the alleged barrier. Def.'s Appx. Ex. C (York Depo.) at 192–93, 195–96. Similarly, a steep slope could constitute a barrier to some mobility-impaired individuals, but perhaps not those in motorized wheelchairs, and certainly not the vision-disabled. *Id.; see also* Mendoza Depo. at 130–31; Sieck Depo. at 35–36. Likewise, gradations in blindness would create different barriers for different levels of vision impairment (i.e., Braille would help some but not others who require audio or large print). Def.'s Appx. Ex. D at 71–72. Defendants also argue that the disparities between the disabled class members in this case is further compounded because Plaintiffs seek to certify a class of both mobility *and* vision impaired individuals. These individuals would obviously be affected differently by different types of barriers. *See* Def.'s Appx. Ex. D at 74–75. Further, there is some limited indication that the groups' interests could already be or become adverse to each other if more attention or accommodation is given to one group over the other. *See* Def.'s Appx. Ex. E.[6]

For their position, Defendants rely on *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir.1993), where the Fifth Circuit reversed and remanded judgment in favor of a class of city employees who claimed disability discrimination based on physical standards imposed on employees who drove as part of their job. With very little analysis, the court reversed certification of the sub-classes of vision-impaired and insulin-dependent diabetic employees because determination of whether the purported class members were handicapped or "otherwise qualified" would require individual determinations about the effect of a claimed impairment on the individual's ability to perform tasks. *Id.* at 1396. Defendants also quote *Sokol v. New United Motor Mfg., Inc.*, 1999 U.S. Dist. LEXIS 20215, *11 (N.D.Cal.1999) for the position that "Courts have been cautious to certify disability discrimination claims as class actions due to the individualized determinations required by such claims." However,

---

**6.** Neither party focused on the issue of whether two subclasses, one of mobility-impaired individuals and the other of vision-impaired individuals, would be appropriate in their class certification

briefs, so the Court makes no ruling on this issue. However, the Court would consider an appropriate motion or stipulation on the issue of vision and mobility subclasses.

*Sokol,* also an employment discrimination case, acknowledged that "[t]he need for individualized determinations, however, has not precluded class actions based on claims of disability discrimination. Courts have certified class actions in the ADA/Rehab Act context where the challenged conduct is a specific policy that allegedly discriminates in a broad-based manner against class members." The *Sokol* court denied certification because the challenged conduct was not a discrete policy with broad application, but instead would require individualized determinations about the reasonable accommodation process for each employee. *Sokol*'s implication that an employer can escape class liability simply by failing to adopt a "specific" or "easily-identifiable" policy has been rejected by later courts. *See Bates v. UPS,* 204 F.R.D. 440, 448 (N.D.Cal.2001). Defendants also quote *Daggett v. Blind Enterprises of Oregon,* 1996 U.S. Dist. LEXIS 22465, *42–44 (D.Or.1996), another employment discrimination case addressing reasonable accommodation in the workplace, where the court refused to certify a class of blind individuals who claimed failure to accommodate because "failing to reasonably accommodate a person's disability necessarily requires an individualized inquiry into the essential functions of the job the individual seeks to perform and the extent of the impairment suffered by the person seeking a particular accommodation."

While these employment discrimination cases do focus to some extent on the individualized determination required to assess differing types and levels of disabilities, none of them preclude certification of a class of individuals with differing types and levels of disabilities in the context of access to public spaces, and all focus on reasonable accommodation in the employment context. Also, Defendants ignore *Armstrong v. Davis,* 275 F.3d 849 (9th Cir.2001), *abrogated on other grounds as recognized by Harris v. Alvarado,* 402 Fed.Appx. 180 (9th Cir.2010). There, the Ninth Circuit affirmed certification of a class of life-with-parole prisoners with several different categories of disabilities—mobility, hearing, visual, learning, and developmental—who claimed that the Board of Prison's policies and practices for parole hearings violated the ADA and Rehabilitation Act. The Ninth Circuit rejected the defendants' argument that the "wide variation in the nature of the particular class members' disabilities precludes a finding of commonality" and separate lawsuits should have been filed by each group. *Id.* at 868. In no uncertain terms, the Ninth Circuit "reject[ed] this approach to class action litigation" and held that commonality in civil rights suits is satisfied where the suit challenges a system-wide pattern or practice that affects all of the class members. *Id.* The Ninth Circuit stated that "the differences that exist here do not justify requiring groups of persons with different disabilities, all of whom suffer harm from the board's failure to accommodate their disabilities, to prosecute separate actions." *Id.* The court also found typicality satisfied because the injury of all plaintiffs was identical—namely a refusal or failure to afford them accommodations as required by law—and minor differences did not defeat typicality. *Id.* at 869. Other cases have similarly certified classes including members with different types of disabilities. *See, e.g., Caltrans* (vision and mobility impaired), *Access Now* (mobility, hearing and sight). Based on the Ninth Circuit's decision in *Armstrong,* and because the individualized assessments of reasonable accommodation in the workplace in the employment discrimination cases relied on by Defendants are distinguishable, the class of vision and mobility impaired individuals proposed by Plaintiffs satisfies the commonality and typicality requirements.

### c. Differences in Reasonableness of Accommodation Needed To Remediate Access Barriers

Defendants argue that an individualized inquiry into the reasonableness and efficacy of the proposed accommodation for each barrier also precludes certification. Defendants rely on *Fortyune v. Am. Multi–Cinema, Inc.,* 364 F.3d 1075, 1083 (9th Cir.2004), which held that "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Fortyune* was a non-class action

case brought by a mobility-impaired individual against a movie theater who refused to evict a non-disabled-companion individual from a companion seat so that his companion could sit next to him. The court held that the requested modification (requiring eviction of non-disabled-companions from disabled-companion seats) was reasonable because the law already required the modification, it did not impose an undue financial or administrative burden and even the potential that the defendant would be forced to call the police to enforce the policy was not unreasonable. *Fortyune* is not analogous to this case.

Defendants further argue that Plaintiffs here seek remediation of thousands of different access barriers across the GGNRA. As just one example, the point to a claimed 1.5% slope deficiency in a path running from a certain parking space to a certain restroom in Fort Barry. Elsberry Decl. Ex. C. at 8:1. They contend that a claim relating to remediation of this barrier necessarily requires analysis of both whether the slope is actually excessively steep, whether any class member was denied access to Fort Barry on the basis of this alleged barrier, whether a given proposed solution would remedy the barrier for the individual in question, and whether the proposed solution is reasonable. They contend that this fact-intensive analysis would be required for each of the thousands of alleged barriers of varying types within GGNRA, and that this type of case-by-case adjudication defeats commonality and typicality.

However, as discussed above, the Court disagrees that it will necessarily need to undertake a barrier-by-barrier, accommodation-by-accommodation evaluation, and instead finds that a common question of whether GGNRA has taken reasonable steps to comply with the Rehabilitation Act and accommodate the disabled by remedying access barriers allows for certification. This conclusion holds equally true for a remediation evaluation.

### d. Are Plaintiffs' Claims Of Deficient Policies or Practices Sufficient?

Defendants argue that, while Plaintiffs claim to rely on a deficient "policy" or "practice," they have not actually pointed to any specific GGNRA policy or practice in their TAC. The TAC does not cite any specific policy or practice, and instead generally alleges an ongoing failure to provide program access to facilities, programs, services and activities. However, the evidence presented in connection with the class certification motion shows various seemingly inadequate policies or practices that Defendants themselves have recognized as pervasive and indeed system-wide. *See* Ex. F (self-assessment finding approximately 30 system-wide deficiencies in policies and procedures).

Defendants argue that the cases discussed above certifying classes challenging a variety of access barriers have done so only in the face of a uniform design policy that allows for a common method of assessing the barriers. To the contrary, *Arnold* certified a class involving design elements in over 70 movie theaters built and updated at various times "some or all of which" existed in "many if not all of defendant's theaters." *Arnold,* 158 F.R.D. at 449. There was no mention of a uniform building plan or blueprint, and the court's qualifying language indicates that one did not exist. *Armstrong* certified a class impacting a number of parole hearing facilities across the state and various types of barriers on the basis of a common policy and practice of failure to accommodate, without requiring any common design blueprint. *Armstrong,* 275 F.3d 849 (9th Cir.2001). *Californians for Disability Rights* certified a class involving thousands of different types of barriers throughout California based on the "use of improper design guidelines and the failure to ensure compliance with even those deficient guidelines," not based on the use of one particular set of plans. *Californians for Disability Rights,* 249 F.R.D. at 345. Though the TAC itself does not identify specific policies or practices being challenged, the evidence presented in connection with this motion does show some systemwide policies that appear to be seriously deficient. *See generally* Elsberry Decl. Ex. F.

Defendants also argue that Plaintiffs cannot satisfy commonality by circularly arguing that all of the alleged barriers share a common element of being an access barrier and

thus indicate some sort of policy or practice. *See* Opp. at 18. Defendants rely on *General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), where the Supreme Court reversed certification of a class of Mexican–American applicants for employment. The Fifth Circuit had affirmed class certification based on its prior decision allowing victims of racial discrimination in employment to maintain an across-the-board attack on all unequal employment practices alleged to have been committed by the employer pursuant to a policy of racial discrimination. The Supreme Court held that, despite the Fifth Circuit's across-the-board rule that racial discrimination is by its nature class discrimination, the requirements of Rule 23 still must be met. *Id.* at 157, 102 S.Ct. 2364. In the case before it, the Court found that the plaintiff had not bridged the gap between demonstrating the validity of his own claim and the existence of a class of people who had suffered the same injury because allegations that he was not promoted due to his ethnicity were insufficient to show that the employer's treatment of the plaintiff was typical of its promotion practices, that the promotion practices were motivated by a policy of ethic discrimination, or that the policy of ethic discrimination was reflected in other employment practices such as hiring. *Id.* at 158, 102 S.Ct. 2364. The Court concluded that, "If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential company-wide class action." *Id.* at 159, 102 S.Ct. 2364. Here, by contrast, Plaintiffs have gone well beyond merely alleging one specific incident of discrimination as in *Falcon,* or even an array of unrelated incidents. Instead, there is evidence of multiple people suffering the same injury (lack of access) and evidence that the injuries were caused by systemwide policies and practices of failing to comply with access requirements as identified by the Defendants themselves, as opposed to the Fifth Circuit's across-the-board assumption that any racial discrimination constitutes class discrimination.

In their Opposition, Defendants also relied on the Ninth Circuit's decision in *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571 (9th Cir.2010), where the Ninth Circuit largely affirmed the district court's decision to certify a class of over a million female workers challenging Wal–Mart's pay and promotion practices. *Id.* at 578. However, following briefing and oral argument on this motion, the Supreme Court reversed the Ninth Circuit's decision, holding that the plaintiffs in *Wal–Mart* had not established the requisite commonality for certification of the class. *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In *Wal–Mart,* "the basic theory of [the plaintiff's] case [wa]s that a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal–Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* at 2548. The Court reasoned that this "pattern or practice" theory required the plaintiffs to show that "discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice." *Id.* at 2552, n. 7. *Wal–Mart* concerned the hiring and promotion of over 1.5 million women in multiple job classifications across approximately 3500 Wal–Mart stores in 50 states. The Court ultimately concluded that the plaintiffs had not come forward with "significant proof that [Wal–Mart] operated under a general policy of discrimination" that would provide "some glue holding together the alleged reasons for [its employment decisions]" and thus there could be no common answer to the question of whether *Wal–Mart* had violated Title VII with respect to its female employees. *Wal–Mart,* 131 S.Ct. at 2551–52. Following the Supreme Court's *Wal–Mart* decision, the parties provided additional briefing on the impact of the decision on the class certification issues before this Court.

Plaintiffs contend that the discussion of commonality in *Wal–Mart* has little or no impact on this case. Plaintiffs point out that *Wal–Mart* was an employment discrimination case brought under Title VII in which the alleged discrimination was based on a policy of discretionary decision-making that Plaintiffs contended allowed bias to affect the

hiring and promotion of women across all of the thousands of Wal–Mart stores nationwide. Plaintiff argues that the Supreme Court's analysis depended heavily on the nature of the class claims asserted in that case and on the type of proof required to prevail on such claims. Specifically, plaintiffs in a Title VII suit must generally prove the reasons behind the challenged employment decisions, *Wal–Mart* at 2552 ("crux of the inquiry [in resolving individual's Title VII claim] is 'the reason for a particular employment decision'"), so the Court's opinion turned on the plaintiffs' failure to show a common factor uniting the reasons behind the million-plus challenged employment decisions. Plaintiffs argue that "the analysis of commonality in *Dukes* was limited to the type of proof required in Title VII cases and the type of evidence the plaintiffs needed to establish liability under Title VII." Pl.'s Supp. Brief at 6. In contrast, in Rehabilitation Act suits such as this one, intent is not at issue and Plaintiffs need not show the reasons (or any common reason) why each of the barriers was erected or removed to prove their claim.[7] Plaintiffs point out that, even under *Wal–Mart,* one common contention capable of classwide resolution in this case is that barriers exist and deprive class members of access, because the truth or falsity of this will "resolve an issue that is central to the validity of the claims in one stroke." Pl.'s Supp. Brief at 6 (quoting *Wal–Mart* at 2551).

Though the Supreme Court did not expressly limit its holding in *Wal–Mart* to Title VII employment discrimination cases, Plaintiffs' arguments are generally persuasive. A reading of the *Wal–Mart* opinion as the whole shows that the Court found the evidence presented to support commonality insufficient because it did not show a common reason for the alleged disparate treatment of female employees. For example, the plaintiff's expert admitted that he could not determine whether less than one percent or 95

percent of Wal–Mart's employment decisions were motivated by stereotypical thinking. *Wal–Mart,* 131 S.Ct. at 2553. Since Rehabilitation Act claims do not require proof of the intent behind the alleged barriers, but instead rely on evidence that they exist across GGNRA and that they deny plaintiffs the benefit of GGNRA programs or activities, the Title VII analysis in *Wal–Mart* is not closely on point. Additionally, in *Wal–Mart* there was evidence of significant localized discretionary decision-making among the approximately 3500 stores across 50 states potentially impacting a class of approximately 1.5 million women, whereas here there is evidence of shows common policies and practices across the GGNRA that result in barriers to access which impact a more closely aligned class. *See* Ex. F. At the same time, Plaintiffs still need to show that the class was harmed by one or more across-the-board discriminatory practices or policies to establish commonality. While this does not require a showing of *intent,* the cause of the barriers (i.e., that they were created or not removed in conformance with one or more systemic discriminatory practices or policies, as opposed to miscellaneous, localized, ad hoc decisions) is still important. Therefore, *Wal–Mart* has some bearing on this case.

Plaintiffs also argue that *Wal–Mart* should not be interpreted as always requiring an "express, centralized policy" in discrimination cases, and that any mention in the opinion of an express policy was simply one way that the Court believed the plaintiffs in *Wal–Mart* could have (but were unable to) shown commonality. Plaintiffs contend that, because they do not have to prove the reasons for any decisions resulting in discrimination, evidence of an express centralized policy is unnecessary. However, even in Rehabilitation Act cases, there must be evidence of some common policy or practice (albeit not an ex-

---

7. Plaintiffs rely on *Ramos v. SimplexGrinnell LP,* 796 F.Supp.2d 346, 355–56 (E.D.N.Y.2011), a recent case that found commonality present the day after the *Wal–Mart* decision. However, *Ramos* was not a Rehabilitation Act case, and distinguished *Wal–Mart* on the basis that plaintiffs had come forward with "significant proof" that the defendant routinely failed to pay prevailing wages for covered work, there was little discretion or subjective judgment present in the challenged pay decisions, and there was no express policy of non-discrimination (as there was in *Wal–Mart* and as there is in this case), while there was admissible classwide data reflecting the improper payments.

press written policy of discrimination) to certify a class.

More persuasively, Plaintiffs argue that they have shown common policies and practices. As discussed elsewhere, NCA's 2010 draft self-evaluation of GGNRA's park-wide policies and procedures identified approximately thirty system-wide deficiencies in policies and procedures that undergirded the failure to remove multiple barriers and supports commonality and typicality. *See* Ex. F. Plaintiffs also point out that decisions within GGNRA are centrally made, unlike in *Wal–Mart* where they were discretionary and delegated to thousands of local managers across stores nationwide. *See Wal–Mart,* 131 S.Ct. at 2555 ("In a company of Wal-mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction."). During oral argument, the Court questioned the parties regarding the centralization of decision-making within the GGNRA. Defendants acknowledged that GGNRA's park superintendent "retains total authority over what's going on in the park," although his authority is "subject to the chain of command up to National Park Service and beyond." Transcript at 10. Plaintiffs also pointed out that funding decisions go from the GGNRA to NPS. *Id.* at 11. There is no dispute that overall governance of the GGNRA, including decisions affecting accessibility, is centrally controlled by the Park Superintendent. This is a very different situation than the nationwide, store-by-store, localized discretionary decision-making at issue in *Wal–Mart.*

Not surprisingly, Defendants interpret *Wal–Mart* very differently, and argue that it precludes certification of the class based on both commonality and Rule 23(b)(2). With respect to commonality, they argue that the decision reaffirms the existing rule that commonality is not satisfied where individual inquiries would be required into each class member's claims. Defendants contend that the permissibility of the thousands of challenged barriers experienced in different ways by individuals with different and varying levels of disability is not an issue that can be resolved "in one stroke," as required by

*Wal–Mart.* However, Defendants' brief quotes a portion of *Wal–Mart* that states that the "crucial" question of commonality is "why was I disfavored." 131 S.Ct. at 2552. This portion of the opinion appears to be specific to claims under Title VII and other similar statutes under which the motive for the discriminatory action is important, unlike the claims at issue here.

Defendants also argue that *Wal–Mart* requires a common discriminatory practice or policy. They contend that the class was not certified because there was no policy acting as the glue holding the reasons for the million-plus alleged discriminatory decisions together, and that similarly here Plaintiff has not shown that the cause of the challenged barriers was a discriminatory policy or practice. The Court agrees that, following *Wal–Mart,* commonality certainly requires more than an allegation that "they have all suffered a violation of the same provision of law." Instead, the "claims must depend upon a common contention—for example, the assertion of a discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551. Thus, the fact that an *individual* Rehabilitation Act claim does not require proof of the reason behind the alleged barrier does not necessarily mean that a *class* need not show some unifying factor uniting the claims for purposes of commonality. However, as discussed above, here Exhibit F is evidence of systemic policies and procedures resulting in the alleged violations of the Rehabilitation Act.

Defendants also attempt to equate the Court's rejection of the *Wal–Mart* plaintiffs' anecdotal evidence regarding various instances of discrimination to the multiple declarations submitted in this case relating individual plaintiff's experiences with various alleged barriers within GGNRA. In *Wal–Mart,* the Court held that the anecdotal evidence presented was insufficient to support a theory that the entire company operated under a

policy of discrimination, and even if the plaintiffs had presented anecdotal evidence from every store they still would "not demonstrate that commonality of issue exists." *Id.* at 2556. However, the Court's conclusion was based on the fact that the anecdotal evidence did not and could not show a common reason behind the challenged employment decisions, which was a crucial issue in *Wal–Mart.* In contrast here, Exhibit F, Plaintiffs' declarations, and the NCA survey reports show general policies and practices of failing to address access barriers resulting in the alleged violations of the Rehabilitation Act.

### 3. Adequacy

▮ Rule 23(a)(4) permits the certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class." Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *See Staton,* 327 F.3d at 957. Plaintiffs have presented undisputed evidence that the named individual and organizational plaintiffs are willing and able to be effective advocates for the class. *See* Gray Decl. ¶ 32; Mendoza Decl. ¶ 14; Sieck Decl. ¶ 10; Sutton Decl. ¶ 16; Lozano Decl. ¶ 15. Further, class counsel Disability Rights Advocates and the individual attorneys handling this case are highly experienced disability rights attorneys who have handled large class actions such as this previously. *See* Paradis Decl. ¶¶ 2–7. Defendants do not contest the adequacy of the named plaintiffs or their counsel.

### C. Rule 23(b)(2)

▮ Plaintiffs seek class certification under Rule 23(b)(2), which provides that a case may be certified as a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The commonality analysis performed above overlaps somewhat with this requirement. *See Californians for Disability Rights v. Caltrans,* 249 F.R.D. 334, 349 (N.D.Cal.2008). In over-

turning a district court's decision to deny class certification, the Third Circuit stated that the Rule 23(b)(2) requirements are "almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 58 (3rd Cir.1994). The *Baby Neal* court noted the "role of (b)(2) class actions in remedying systemic violations of basic rights of large and often amorphous classes" and held that "[t]he writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicate their own rights." *Id.* at 64–65 (citing Rules Advisory Committee Notes to 1966 Amendments to Rule 23, 39 F.R.D. 102 (1966); 1 *Newberg & Conte,* § 4.11 at 4–39).

Defendants oppose certification of a Rule 23(b)(2) class because they contend that the broad injunction sought in the TAC ("order enjoining Defendants from violating Section 504(a) of the Rehabilitation Act") cannot be issued under Rule 65. Specifically, Rule 65(d) requires that: "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." One court has held that "Rule 23(b)(2)'s bottom line, therefore, demands at the class certification stage plaintiffs describe in reasonably particular detail the injunctive relief they seek 'such that the district court can at least 'conceive of an injunction that would satisfy [Rule 65(d)'s] requirements,' as well as the requirements of Rule 23(b) (2).'" *DG ex rel. Stricklin v. Devaughn,* 594 F.3d 1188, 1200 (10th Cir.2010) (internal citations omitted). Defendants argue that no injunction in this case could satisfy Rule 65's standard of specificity and yet encompass all of the class claims as required by Rule 23(b).

Defendants correctly point out that cases interpreting Rule 65 generally preclude the issuance of a broad injunction to "obey the law," which is what Plaintiffs' TAC appears to seek. *See, e.g., Cuviello v. City of Oakland,* 2009 WL 734676, *2–4, 2009 U.S. Dist.

LEXIS 26067, *9–11 (N.D.Cal.2009) (stipulated protective order essentially requiring defendants to obey the law too vague to be enforceable). Plaintiffs counter that they will present evidence supporting an injunction providing specific directions to Defendants to meet their access obligations. *See* Elsberry Decl. Ex. I at 5–6. To date, Plaintiffs have not proposed any specific language for an injunction that would meet Rule 65. However, the Court believes that it would be possible to fashion an appropriate injunction covering Plaintiffs' class claims. *See, e.g., Caltrans,* 249 F.R.D. 334; *Arnold,* 158 F.R.D. 439; *Taco Bell,* 220 F.R.D. 604.

Defendants also argue that, to the extent that Plaintiffs seek a series of injunctions remediating the thousands of alleged barriers, these injunctions would not resolve class claims as a whole as required by Rule 23. They contend that not all of the named plaintiffs have experienced all of the alleged barriers and they would have to be examined and remediated one by one. This is repetitive of Defendants' commonality/typicality arguments, and for the reasons discussed above the Court does not agree that Plaintiffs are seeking a series of thousands of injunctions covering each individual barrier. *See* Rules Advisory Committee Notes to 1966 Amendments to Rule 23, *reprinted* at 39 F.R.D. 69, 102 (1966) ("Action or inaction is directed to a class within the meaning of [Rule 23(b)(2) ] even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."). The fact that not every plaintiff has experienced every alleged barrier does not necessarily require that the barriers be remedied in thousands of separate injunctions.

Defendants also cite a Tenth Circuit case, *Shook v. Bd. of County Commissioners,* 543 F.3d 597, 608 (10th Cir.2008), which affirmed denial of certification of a class of current and future mentally-ill inmates partially on the basis that the court could not conceive of an injunction that would satisfy Rule 23(b)(2) for all of the claims. The plaintiffs' claims there were based on a variety of alleged violations of their rights, including denial of medication, lack of supervision, and excessive force, among others, and the district court concluded that "many of the matters plaintiffs sought to have addressed, such as the use of tasers or restraints, could not be dealt with prospectively on a class-wide basis because the propriety of using such methods depended on the circumstances in which they were used, and those circumstances necessarily varied among class members." *Id.* at 602–603; *see also Vallario v. Vandehey,* 554 F.3d 1259, 1268 (10th Cir.2009) (reversing certification of Rule 23(b)(2) because district court did not hold plaintiffs to burden of showing that appropriate injunctive relief could be fashioned). However, cases within the Ninth Circuit have taken a more liberal view of Rule 23(b)(2) requirements. *See Caltrans,* 249 F.R.D. at 349 (finding that the case was "precisely the sort of civil rights case contemplated by Rule 23(b)(2)" despite the wide ranging alleged barriers and differing types of disabilities of the class members); *Arnold,* 158 F.R.D. at 454 (finding Rule 23(b)(2) satisfied in part because differences among the alleged access violations at the various theaters were irrelevant because violations would generally affect disabled class members in the same way).

Defendants again rely on the Supreme Court's recent *Wal–Mart* decision, which reversed the Ninth Circuit's affirmation of a Rule 23(b)(2) class because the backpay sought was not incidental to the requested injunctive relief and Wal–Mart was entitled to individualized determinations of each employee's eligibility for backpay. 131 S.Ct. at 2557–61. However, here Plaintiffs seek only injunctive relief and do not request monetary relief of any kind. Defendants further rely on *Wal–Mart*'s holding that a 23(b)(2) class should not be certified where the defendant is entitled to individualized statutory defenses to individual backpay claims (i.e., that it took a challenged employment action for a reason other than discrimination). *Id.* at 2560–61. Defendants contend that they are similarly entitled to present individualized defenses as to the characteristics of each challenged barrier and its effect on various types of disabled individuals. Defendants also argue that Plaintiffs cannot rely on the policies identified in the NCA Report to support an injunction because they are entitled

to individual defenses as to the impact of those policies on various members of the class. The Court disagrees that Wal–Mart's statutory defense to each Title VII backpay claim can be equated to Defendants' potential defenses here. The individual defenses in *Wal–Mart* related to whether Wal–Mart would be required to pay monetary penalties to each of millions of individuals, whereas Defendants "individual defenses" here include whether and how the overall injunction will benefit class members, but do not impact what Defendants would be required to do.

Defendants also argue that, under *Wal–Mart*, Rule 23(b)(2) only applies when "a single injunction or declaratory judgment would provide relief to each member of the class," and precludes certification where individual class members would be entitled to different relief. *Id.* at 2557. In *Wal–Mart*, the Court stated that the key to a Rule 23(b)(2) class is the "indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* Here, reform of the deficient policies identified in Exhibit F could constitute such a remedy. For example, that review identified, among others, a complete absence of "a written policy for the accessibility review of new construction, alterations or renovation of structures, developed landscapes or physical environments," as well as "a pattern of planning, development and construction by concessioners or park partners where the new construction or alteration does not meet the minimum accessibility guidelines." Ex. F at 5, 7. Such deficiencies, if proven at trial, might conceivably be remedied by an injunction that required such a written policy and training on its implementation for new construction and alterations by both Defendants and their partners. Thus, it appears that an injunction could be formulated that would be sufficiently specific and would resolve the class claims, and that the defenses that may be asserted by Defendants do not preclude certification.

### D. Necessity

Defendants finally argue that a class action is unnecessary to achieve Plaintiffs' request-

ed relief, which at its heart seeks modification of barriers throughout GGNRA. They contend that any modifications ordered by the Court for the benefit of Plaintiffs would necessarily inure to the benefit of the proposed class without the expense of a class action. *See James v. Ball,* 613 F.2d 180, 186 (9th Cir.1979) (upholding denial of class certification without discussion of Rule 23 requirements because the relief sought would produce the same result as class-wide relief); *see also Sokol,* 1999 U.S. Dist. LEXIS 20215, *17 (denying class certification in part because "all putative class members would benefit from an injunction issued on behalf of a single plaintiff" so "class vehicle is not necessary to obtain the relief sought"). At the same time, however, Defendants argue inconsistently that any relief should be limited to the barriers specifically experienced by the named Plaintiffs. In any event, necessity is not a factor under Rule 23, but at most goes to the exercise of discretion. *See Caltrans,* 249 F.R.D. at 349 ("there is no requirement that class certification must be 'necessary' "). The Court is not persuaded that it should deny certification on this basis.

**IT IS SO ORDERED.**